IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 12-00010-01/02-CR-W-HFS |
| ) | |
| LUIS ACOSTA, and ) | |
| ARMANDO G. RODRIGUEZ, ) | |
| ) | |
| Defendants. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Rodriguez' Motion to Suppress Evidence (doc #32) and defendant Acosta's Motion to Suppress Evidence (doc #39).[1] For the reasons set forth below, it is recommended that these motions be denied.

I. INTRODUCTION

On December 16, 2011, a criminal complaint was filed against Luis Acosta and Armando G. Rodriguez. On January 11, 2012, the Grand Jury returned a three-count indictment against defendants Acosta and Rodriguez. Count One of the indictment charges that on December 15, 2011, defendants Acosta and Rodriguez conspired with each other and others to distribute five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine. Counts Two and Three charge that on December 15, 2011, defendants Acosta and Rodriguez, respectively, possessed with intent to distribute five hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine.

On April 12, 2012, an evidentiary hearing was held on defendants' motions to suppress. Defendant Acosta was represented by Assistant Federal Public Defender Larry C. Pace. Defendant Rodriguez was represented by appointed counsel Cenobio Lozano, Jr. The Government was

---

[1] Before filing his own motion to suppress, defendant Acosta filed a Motion for Leave to Join Co-Defendant's Motion to Suppress (doc #34). Given that defendant Acosta later filed a separate motion to suppress, the motion for leave to join in defendant Rodriguez' motion is moot.

represented by Assistant United States Attorney Jalilah Otto. The Government called Corporal Greg Primm of the Missouri State Highway Patrol as a witness. The defense called no witnesses to testify.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. Corporal Greg Primm has been employed by the Missouri State Highway Patrol for over ten years. (Tr. at 4) Corporal Primm was promoted from trooper to corporal three years ago. (Tr. at 4-5) As a corporal, Corporal Primm supervises others. (Tr. at 5) The primary function of troopers and corporals in the Missouri State Highway Patrol is to enforce traffic laws in the State of Missouri. (Tr. at 5) Corporal Primm solely works the interstates looking for traffic violations and any subsequent criminal arrests. (Tr. at 5) Corporal Primm has been focusing on interdiction cases since December of 2010. (Tr. at 6)

2. Corporal Primm has received training for interdiction investigations. (Tr. at 5) Specifically, Corporal Primm has gone through three 40-hour courses relating to interdiction; one focused on the detection of contraband in commercial motor vehicles; the second on detecting criminal activity on the highways; and the third on much the same training, i.e. being observant, conducting high-volume legal traffic stops and being attentive while doing your job. (Tr. at 5, 7) Corporal Primm was taught to use his powers of observation while conducting traffic stops to focus and narrow in on people that may be involved in criminal activity. (Tr. at 6) Corporal Primm looks for things that are not consistent with the innocent motoring public that he observes. (Tr. at 6) Corporal Primm has also attended an interdiction course specifically geared towards different methods that people may use to hide contraband inside a vehicle. (Tr. at 7)

3. On December 15, 2011, Corporal Primm was on the right shoulder of eastbound Interstate 70 at approximately the 61 mile marker in Saline County, Missouri. (Tr. at 8) Corporal Primm had just completed a traffic stop. (Tr. at 8) Corporal Primm was working in tandem with Sergeant Brooks McGinnis. (Tr. at 7-8) They were in separate vehicles, but within radio contact of each other. (Tr. at 8) Corporal Primm observed a white Chevrolet Cobalt with a California license plate in the left lane, the passing lane, of the interstate. (Tr. at 9) The white vehicle was covered with a large amount of road grime. (Tr. at 9) However, the front license plate was clean; it appeared to have been hand-washed and Corporal Primm found that strange. (Tr. at 9) Most of the other vehicles on the interstate did not have road grime on them like the Cobalt, so Corporal Primm believed it had come from out of the area. (Tr. at 10) The Cobalt had other cars behind it, but it was traveling in the passing lane. (Tr. at 11) As the Cobalt passed by Corporal Primm, Corporal Primm noticed that the two occupants in the front seat had rigid posture and they did not appear comfortable. (Tr. at 11) The occupants did not look towards Corporal Primm. (Tr. at 11) From these observations, Corporal Primm felt that the occupants of the Cobalt had some fear of his presence. (Tr. at 57-58) Corporal Primm noticed that the taillights and the rear license plate had also been hand-washed, but no other part of the vehicle.

2

(Tr. at 11) Corporal Primm then saw the driver of the Cobalt look up into his rearview mirror back at Corporal Primm's location, as if he were keeping track of what Corporal Primm was doing. (Tr. at 11) Corporal Primm found that to be suspicious. (Tr. at 11) Corporal Primm contacted Sergeant McGinnis by radio and asked if he had seen the vehicle with the cleaned off license plates. (Tr. at 29) Sergeant McGinnis responded yes, but then the transmission garbled and Corporal Primm could not understand what he said. (Tr. at 29)

4. Corporal Primm entered the interstate and followed the Chevrolet Cobalt. (Tr. at 12) The Cobalt was traveling below the posted speed limit of 70 miles per hour. (Tr. at 12) Corporal Primm paced the vehicle speed at approximately 65 miles per hour. (Tr. at 12) The Cobalt remained in the left lane. (Tr. at 12) Four vehicles remained behind the Cobalt unable to pass on the left. (Tr. at 12) Corporal Primm observed the Cobalt continue to commit the traffic violation of failing to travel in the right lane on a roadway having two or more lanes for approximately two miles. (Tr. at 12-13) Corporal Primm testified that there was nothing in the right lane to prevent the driver of the Cobalt from making a safe lane change and then travel legally in the right lane. (Tr. at 63)

5. Corporal Primm initiated a traffic stop of the Chevrolet Cobalt for the traffic violation at 12:09 p.m. (Tr. at 13, 15; Government's Ex. 1) Initially, the Cobalt traveled to the left shoulder. (Tr. at 15) It then moved to the right lane and then onto the right shoulder and stopped. (Tr. at 15) Corporal Primm approached the vehicle from the passenger's side and made contact with the two occupants of the vehicle. (Tr. at 15) Corporal Primm introduced himself and explained the reason for the traffic stop. (Tr. at 16) Corporal Primm spoke to the occupants in English. (Tr. at 16) The driver apologized for the violation. (Tr. at 16) Corporal Primm asked the driver for his driver's license and the driver provided a California driver's license. (Tr. at 17) Corporal Primm noticed that the driver's hand trembled as he handed Primm the license. (Tr. at 17-18) Corporal Primm testified that it is not unusual for people to be nervous with law enforcement, but typically, that nervousness subsides as the traffic stop goes on. (Tr. at 18) The name on the license was Armando Rodriguez. (Tr. at 17)

6. The passenger (later identified as Luis Acosta) was sitting looking forward. (Tr. at 18, 22) He had an open roadmap on his lap and a Boost Mobile cell phone in his hand. (Tr. at 18) Corporal Primm saw an identical Boost Mobile cell phone in the center console and an Apple iPhone on the driver's side seat beside Mr. Rodriguez' leg. (Tr. at 18) Corporal Primm found it suspicious that the two occupants of the vehicle had three cell phones and that two of the cell phones were identical down to the little yellow pieces of tape on the back of each of them. (Tr. at 18) Based on his training and experience, Corporal Primm knew that people who haul drugs across the country are given cell phones by other people within the organization so that they can track them and communicate with them throughout the trip. (Tr. at 18-19)

7. After receiving the driver's license, Corporal Primm asked the driver, Mr. Rodriguez, for proof of insurance on the vehicle. (Tr. at 19) Corporal Primm was again speaking in English. (Tr. at 19) The passenger, Mr. Acosta, then opened the glove box and retrieved the insurance card. (Tr. at 19) Corporal Primm noticed that Acosta's hand was trembling and the insurance card was shaking in his hand. (Tr. at 19) Corporal Primm found this to be unusual behavior for a passenger in a vehicle stopped for a traffic violation. (Tr. at 19)

3

8. Corporal Primm advised Mr. Rodriguez that he would be issued a warning for the violation and Primm asked Rodriguez to accompany him to the patrol car to complete that process. (Tr. at 19-20) In order to issue a warning, Corporal Primm has to fill out a form which asks for various pieces of information. (Tr. at 20) The warning process is standard procedure with the Missouri State Highway Patrol. (Tr. at 20) Corporal Primm asked Rodriguez to accompany him to the patrol car for both officer safety purposes and so that the form could be filled out quickly. (Tr. at 21-22) Corporal Primm testified that he also wanted to explore a little bit as to why the license plates had been cleaned off and why Rodriguez appeared nervous. (Tr. at 22) Corporal Primm wanted to make sure there was no illegal activity taking place. (Tr. at 22)

9. As Mr. Rodriguez was walking back to the patrol car, Corporal Primm asked Mr. Acosta where they were traveling. (Tr. at 22) Acosta responded in English, "I don't speak English." (Tr. at 22) Corporal Primm then asked Acosta if he had any ID and Acosta responded in English, "Do you want my ID?" (Tr. at 22) Corporal Primm said yes and Acosta provided a California identification card with his name on it. (Tr. at 22) Corporal Primm's suspicions were raised because he felt that Acosta had a better command of the English language than he wanted Primm to know so that Primm would not have further discussions with him or so that they would not discuss Acosta's destination. (Tr. at 23)

10. In the patrol car, Mr. Rodriguez initiated a conversation with Corporal Primm about how much warmer it had been in California than it was here. (Tr. at 23) Corporal Primm asked Rodriguez where he was traveling now and Rodriguez responded Michigan. (Tr. at 23) Corporal Primm told Rodriguez that it would be much colder in Michigan than it was in Missouri. (Tr. at 23) Rodriguez said he was traveling to Michigan to see his sister for three days, but he did not know the name of the city. (Tr. at 23-24) He told Corporal Primm that he was going to call when he got close. (Tr. at 23-24) Corporal Primm asked Rodriguez if he was going to the upper peninsula or the lower peninsula of Michigan which would impact the route of travel, but Rodriguez did not know that either. (Tr. at 24) Based on his training and experience, Corporal Primm found this to be suspicious. (Tr. at 24)

11. Mr. Rodriguez appeared to be very nervous while Corporal Primm was putting information into the warning citation. (Tr. at 24) It takes from seven to eleven minutes to input the information into the computer. (Tr. at 25) During this time, Rodriguez' breathing was rapid and shallow. (Tr. at 24) When Rodriguez inhaled, Corporal Primm could hear him gasping for air. (Tr. at 24) Corporal Primm asked Rodriguez if he had a medical condition that caused him to breathe like that and Rodriguez replied, "No, I'm just nervous." (Tr. at 24) Corporal Primm explained to Rodriguez again that he was just giving him a warning, but Rodriguez' nervousness did not subside. (Tr. at 24) Corporal Primm testified that typically, if he tells a motorist that he is just giving them a warning, their nervousness subsides. (Tr. at 24-25) Corporal Primm asked Rodriguez if they had driven all night or stopped to sleep and Rodriguez said they had stayed in a hotel in Denver. (Tr. at 41) Since it was just shortly after noon, Corporal Primm found this suspicious and commented that they must not have slept in the hotel very long. (Tr. at 41; Government's Ex. 1) Rodriguez said they had left the hotel at midnight. (Tr. at 42)

12. At approximately 12:15 p.m., while still putting information into the computer, Corporal Primm asked Mr. Rodriguez who owned the vehicle. (Tr. at 25) Rodriguez

4

told Corporal Primm that he did not know who owned the vehicle. (Tr. at 25) Corporal Primm testified that this really raised his suspicions. (Tr. at 25) Based on his training and experience, Corporal Primm knew that oftentimes third-party vehicles are used to transport contraband across the United States. (Tr. at 25) The name on the insurance card was Maria Ortiz. (Tr. at 26) Corporal Primm asked Rodriguez for the name of his passenger and Rodriguez responded Luis. (Tr. at 26) Corporal Primm asked Rodriguez for Luis' last name. (Tr. at 26) Rodriguez paused and thought about it and then said Acosta. (Tr. at 26) Corporal Primm asked Rodriguez how long he had known Mr. Acosta and Rodriguez responded about six months. (Tr. at 26) Corporal Primm asked if Acosta knew Rodriguez' sister and Rodriguez said that he did not and that he was just along for the ride. (Tr. at 26) Corporal Primm testified that Rodriguez' nervousness was not subsiding and Primm felt certain that Rodriguez and Acosta were involved in criminal activity. (Tr. at 26; Government's Ex. 1) Corporal Primm denied that his suspicions had anything to do with the fact that Rodriguez and Acosta were Hispanic. (Tr. at 55)

13. Corporal Primm asked Mr. Rodriguez if he had any drugs in the vehicle. (Tr. at 27) Rodriguez shrugged his shoulders and said, "No." (Tr. at 27) Corporal Primm testified that Rodriguez' body language was not consistent with his answer. (Tr. at 27) Corporal Primm asked Rodriguez, "May I search your vehicle?" (Tr. at 27) Rodriguez said, "Yeah, sure." (Tr. at 27) Corporal Primm asked Rodriguez what he was responsible for inside the vehicle and Rodriguez said the red backpack on the backseat was his. (Tr. at 27) Rodriguez then raised his hands and said, "But it's not my car." (Tr. at 27)

14. At this point, Sergeant McGinnis arrived on the scene. (Tr. at 28) Corporal Primm told Sergeant McGinnis that he was going to be conducting a vehicle search based on the driver's consent. (Tr. at 28) Sergeant McGinnis advised that he had observed this vehicle travel past him at the 58 mile marker, that it was following another vehicle too closely at the time and that he had noticed that the occupants of the vehicle appeared rigid and nervous and scared of his presence. (Tr. at 28) However, when Sergeant McGinnis had attempted to overtake the vehicle, he was not able to locate it. (Tr. at 28) Sergeant McGinnis suspected that the vehicle had exited the interstate at the 58 mile marker in Concordia, Missouri, after seeing him and then returned to the interstate moments later as there would not have been enough time for them to stop for gas or food. (Tr. at 29-30; Government's Ex. 1)

15. Corporal Primm approached the vehicle to conduct the search. (Tr. at 30) Corporal Primm asked Mr. Acosta in English if he had any drugs or guns in the vehicle. (Tr. at 30) Acosta responded, "No." (Tr. at 30) Corporal Primm told Acosta that he had been given consent to search the vehicle by the driver. (Tr. at 30) Acosta responded, "I don't speak English. I don't understand." (Tr. at 30) Corporal Primm asked Acosta to exit the vehicle and he did. (Tr. at 31) Corporal Primm performed a <u>Terry</u> search of Acosta's person because he was wearing a bulky winter coat and Primm believed that he was involved in criminal activity. (Tr. at 62; Government's Ex. 1) Corporal Primm then began his search of the vehicle. (Tr. at 31) Corporal Primm first looked inside the red backpack on the backseat; there was nothing inside there. (Tr. at 31) Corporal Primm then opened the trunk. (Tr. at 31) There was a black suitcase in the trunk which contained only clothing. (Tr. at 31) Corporal Primm searched the typical areas in the trunk area where contraband might be concealed, but found nothing. (Tr. at 31) Corporal Primm then opened the rear passenger door and looked inside. (Tr. at 31) Corporal Primm observed that the trim pieces had carpet

5

over the top of them where it should have been tucked in. (Tr. at 31) Corporal Primm further observed that padding was protruding from under the seat. (Tr. at 31) Corporal Primm raised the backseat and saw three Tupperware containers that were pushed up into where foam of the seat had been cut away. (Tr. at 31-32) Corporal Primm opened the containers and found within them a crystal substance consistent with the appearance of methamphetamine. (Tr. at 32) The search was concluded at 12:30 p.m. (Tr. at 32)

16. Mr. Rodriguez and Mr. Acosta were taken into custody. (Tr. at 32) One other trooper, Trooper Hanrahan arrived on the scene after the search and after Rodriguez and Acosta were taken into custody. (Tr. at 38) The vehicle was moved to a tow lot where a more thorough search of the vehicle was completed. (Tr. at 38) No additional contraband was recovered. (Tr. at 32) During the subsequent search at the tow lot, Corporal Primm located registration papers which indicated that Maria Ortiz and Luis Acosta were the registered owners of the vehicle. (Tr. at 40) Acosta was never asked for his permission to search the vehicle. (Tr. at 40-41)

17. Corporal Primm's vehicle does not have the ability to record in either video or audio. (Tr. at 35) Sergeant McGinnis' vehicle does have the ability to record, but Corporal Primm does not know whether it was functioning on December 15, 2011, because the system is hit and miss on reliability. (Tr. at 36) Corporal Primm testified that there was no video or audio recording of this search. (Tr. at 37)

## III. DISCUSSION

Defendants seek to suppress the government's use in evidence at trial of any and all items seized and statements taken following the stop of the vehicle. Defendant Rodriguez argues that "under the Fourth Amendment it was not reasonable for Corporal Primm, in a routine traffic stop, to detain the defendants for the purpose of interrogation on matters unrelated to the traffic violation, without, at that point, having any reasonable, articulable grounds for suspicion of illegality." (Motion to Suppress (doc #32) at 3) Defendant Acosta argues that "information known to the Highway Patrol not only failed to amount to reasonable suspicion supporting a Terry stop, it fell far short of probable cause required to support a warrantless arrest or detention of Acosta and Rodriguez while other officers arrived to assist in the subsequent search and interrogation." (Motion to Suppress Evidence (doc #39) at 3-4)

The initial stop of the vehicle was lawful. As the Eighth Circuit Court of Appeals has observed, "any traffic violation, however minor, gives an officer probable cause to stop a vehicle." United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009). Accord United States v. Lyons, 486 F.3d 367, 371 (8th Cir. 2007); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert.

6

denied, 538 U.S. 992 (2003). Prior to pulling the vehicle over, Corporal Primm observed the vehicle continue to commit the traffic violation of failing to travel in the right lane on a roadway having two or more lanes[2] for approximately two miles. (See Fact No. 4, supra) This traffic violation provided probable cause to stop the vehicle. The fact that Corporal Primm might also have suspected that the subjects inside the vehicle were up to something does not invalidate the traffic stop. In United States v. Cummins, 920 F.2d 498 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991), the Eighth Circuit Court of Appeals found:

> In our view, this otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity. It is also our view that the stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.

Id. at 501. See also United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009)("irrelevant that the officer may have ignored the violation were it not for a suspicion that greater crimes are afoot"); United States v. Herrera-Gonzalez, 474 F.3d 1105, 1109 (8th Cir. 2007)("the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop").

Under Terry v. Ohio, 392 U.S. 1, 20 (1968), given the lawfulness of the initial stop, the question is whether the resulting detention was "reasonably related in scope to the circumstances which justified the interference in the first place." "The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration ... [and] inquire into the driver's destination and purpose for the trip ..." United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002), cert. denied, 538 U.S. 992 (2003). Accord United States v. Ward, 484 F.3d 1059, 1061 (8th Cir. 2007). The Court finds that throughout the time Corporal Primm was putting information into the computer with respect to the traffic warning, he had asked no questions

---

[2]The state law provides:

> 6. All vehicles in motion upon a highway having two or more lanes of traffic proceeding in the same direction shall be driven in the right-hand lane except when overtaking and passing another vehicle or when preparing to make a proper left turn or when otherwise directed by traffic markings, signs or signals.

Mo. Rev. Stat. § 304.015.

7

nor taken any action beyond what was appropriate for a routine traffic stop. However, Corporal Primm was becoming more and more suspicious that Rodriguez and Acosta were involved in criminal activity.[3] "The circumstances and unusual behavior he had encountered led [Corporal Primm] 'reasonably to conclude in light of his experience that criminal activity may [have been] afoot.'" United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990)(quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). The totality of the circumstances known to Corporal Primm met the requisite level of reasonable suspicion under Terry and entitled him to detain the defendants until he had satisfied his suspicions. See Cummins, 920 F.2d at 502.

Where circumstances support suspicions unrelated to the traffic offense, an officer may expand the scope of the stop to ask additional, more intrusive, questions. See United States v. Ward, 484 F.3d 1059, 1062 (8th Cir. 2007). Here, the scope of the stop expanded and Corporal Primm asked Mr. Rodriguez if he had any drugs in the vehicle to which Rodriguez shrugged his shoulders and said, "No." (See Fact No. 13, supra) Corporal Primm testified that Rodriguez' body language

---

[3]Even before he stopped the vehicle for the traffic violation, Corporal Primm's suspicions had been raised by the facts that the license plates on the otherwise grimy vehicle appeared to have been hand-washed; that the two occupants in the front seat of the vehicle had rigid posture and did not look towards Corporal Primm as they passed him, appearing to have some fear of Corporal Primm's presence; and the driver of the vehicle looked up into his rearview mirror back at Corporal Primm's location, as if he were keeping track of what Corporal Primm was doing. (See Fact No. 3, supra) After he stopped the vehicle, Corporal Primm's suspicions continued to be raised by the extreme nervousness of the driver and passenger. (See Fact Nos. 5, 7 and 11, supra) Further, Corporal Primm found it suspicious that the two occupants of the vehicle had three cell phones, two of which appeared identical down to the little yellow pieces of tape on the back of each of them, because Primm knew that people who haul drugs across the country are given cell phones by other people within the organization so that they can track them and communicate with them throughout the trip. (See Fact No. 6, supra) Next, Corporal Primm's suspicions were raised because he felt that the passenger, defendant Acosta, had a better command of the English language than he wanted Primm to know so that Primm would not have further discussions with him or so that they would not discuss Acosta's destination. (See Fact No. 9, supra) Defendant Rodriguez' conversation with Corporal Primm further fueled Primm's suspicions in that Rodriguez said he was traveling to Michigan to see his sister, but he did not know the name of the city or whether he was going to the upper or lower peninsula of Michigan. (See Fact Nos. 8 and 10, supra) Corporal Primm asked Rodriguez if Acosta knew Rodriguez' sister and Rodriguez said that he did not and that he was just along for the ride. (See Fact No. 12, supra) Finally, Corporal Primm found it very suspicious that Rodriguez did not know who owned the vehicle he was driving. (Id.) Based on his training and experience, Corporal Primm knew that oftentimes third-party vehicles are used to transport contraband across the United States. (Id.)

was not consistent with his answer. (Id.) Corporal Primm requested and was given consent to search the vehicle by Rodriguez, the driver of the vehicle. (Id.) Corporal Primm asked Mr. Acosta in English if he had any drugs or guns in the vehicle and Acosta responded, "No." (See Fact No. 15, supra) Corporal Primm told Acosta that he had been given consent to search the vehicle by the driver and Acosta responded, "I don't speak English. I don't understand." (Id.) Corporal Primm asked Acosta to exit the vehicle and performed a pat-down search of Acosta's person. (Id.) "The officers may take such additional steps as are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" United States v. Doffin, 791 F.2d 118, 120 (8th Cir.), cert. denied, 479 U.S. 861 (1986)(quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). Corporal Primm's action in bringing defendant Acosta out of the vehicle and patting him down for weapons was reasonably necessary to protect the officers' personal safety and to maintain the status quo so that the officers could determine whether Rodriguez and Acosta were engaged in criminal activity.

Defendants claim that their detention lasted longer than necessary to effectuate the purpose of the stop. However, the evidence before the Court is that Corporal Primm asked defendant Rodriguez for consent to search the vehicle soon after he was stopped.[4] The Court finds that Corporal Primm acted diligently to obtain information and investigate the suspicions which that information aroused. See United States v. Foley, 206 F.3d 802, 806 (8th Cir. 2000). No constitutional violation occurred with respect to the stop of the vehicle.

With respect to the search of the vehicle, the Court notes that a search conducted pursuant to a valid consent does not violate the Constitution. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983); United States v. Matthews, 603 F.2d 48, 51 (8th Cir. 1979), cert. denied, 444 U.S. 1019 (1980). The test in reviewing a consent

---

[4] At approximately 12:09 p.m., Corporal Primm initiated the stop of the vehicle. (See Fact No. 5, supra) By 12:30 p.m., the stop, the gathering of information for the issuance of the warning, the consent to search, the search and the recovery of the methamphetamine had all occurred. (See Fact Nos. 15, supra)

9

search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See United States v. Palacios-Suarez, 149 F.3d 770, 772 (8th Cir. 1998); United States v. Turpin, 707 F.2d 332, 334 (8th Cir. 1983). In United States v. Sanchez, 156 F.3d 875 (8th Cir. 1998), the Eighth Circuit Court of Appeals set forth the following with respect to the relevant circumstances:

> Whether consent is voluntary depends upon the "totality of the circumstances." When evaluating such circumstances, we pay particular attention to the characteristics of the person giving consent and to the encounter from which the consent arose. Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation. To assess the environment surrounding the consent, we consider the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search.

Id. at 878 (citations omitted).

Corporal Primm testified that defendant Rodriguez gave him verbal consent to search the vehicle. (See Fact No. 13, supra) As set forth above, very little time elapsed between the officer stopping Rodriguez and Rodriguez giving consent to search. Rodriguez was not in custody when he consented to the search; he was merely receiving a warning for a traffic violation. (See Fact No. 11, supra) No evidence was presented to suggest that Corporal Primm physically threatened or intimidated Rodriguez in order to obtain his consent. Rodriguez was 45 years old. (See Indictment at 1 which gives Rodriguez' date of birth as 12/20/1965) The Government met its burden in establishing that defendant Rodriguez' consent to search was freely and voluntarily given and not the result of duress or coercion. No constitutional violation occurred with respect to the search of the vehicle.

Defendants' final argument, that statements[5] made as the result of the illegal arrests are fruits of the poisonous tree and must, therefore, be suppressed, also fails. As set forth above, contrary to

---

[5] The Court notes that no testimony regarding any statements made by defendants following their arrests was presented at the hearing.

defendants' arguments, no constitutional violation occurred with respect to the stop of the vehicle, the subsequent search or the arrests of defendants. Therefore, any statements made by defendants following their arrests could not be considered fruit of the poisonous tree.

## IV. CONCLUSION

For the reasons set forth above, it is

ORDERED that defendant Acosta's Motion for Leave to Join Co-Defendant's Motion to Suppress (doc #34) is moot. It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant Rodriguez's Motion to Suppress (doc #32) and defendant Acosta's Motion to Suppress Evidence (doc #39).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                   */s/ Sarah W. Hays*
                                                         SARAH W. HAYS
                                      UNITED STATES MAGISTRATE JUDGE